### BIRD v. STIMSON.

1. EJECTMENT—TITLE TO REALTY.
   A plaintiff in ejectment must recover upon the strength of his own title, and not upon the weakness of the title of his adversary.[1]

2. SAME—BURDEN OF PROOF.
   The burden rested upon plaintiff to establish the existence of the tract claimed by him between two lots, in the place stated, to which he had obtained title.

3. BOUNDARIES—RULE.
   If courses and distances do not agree courses will, as a general rule, govern.

4. EJECTMENT—EVIDENCE—SUFFICIENCY.
   In an action of ejectment to recover a strip of land between two lots, evidence *held,* insufficient to sustain a verdict for plaintiff.

[1]On the general rule that plaintiff must recover, if at all, on the strength of his own title, see note in 18 L. R. A. 781.

5. DEEDS—QUITCLAIM DEEDS—ESTATES CREATED.
   The grantee in a quitclaim deed acquires the right and
   title which his grantor had, and no other.

Error to Oakland; Smith, J. Submitted January
12, 1917. (Docket No. 106.) Decided September 27,
1917. Rehearing denied March 28, 1918.

Ejectment by George L. Bird against Edward I.
Stimson. Judgment for plaintiff. Defendant brings
error. Reversed.

*Williams C. Harris,* for appellant.

*Doty & Cram,* for appellee.

The action is ejectment, begun August 23, 1913,
plaintiff claiming to own in fee and to be wrongfully
dispossessed by defendant of land described in the
declaration as follows:

"Surplus parcel of land between lots ten and eleven
(10-11), on unrecorded plat of Scarborough Beach,
situated east of Pine Lake, southeast quarter of sec-
tion twelve (12) in town two (2) north, range nine
(9) east of Michigan meridian eight degrees described
as follows: Beginning at an iron stake on the west side
of public road called Glenwood avenue, 348 feet, north-
erly measured along the west side of said road from
a white oak tree on the division line of said quarter
section; thence westerly to stake on the shore of Pine
Lake 412 feet northeasterly along shore line from
above-named division line of said quarter section;
thence northeasterly along said shore twenty-eight
feet to a stake on the south line of lot ten; thence
easterly to stake on Glenwood avenue; thence south
nine and one-half feet to place of beginning."

Upon a trial, certain issues of fact were submitted
to a jury, which returned a verdict for plaintiff, who
had judgment. Neither the verdict nor the judgment
specifies the estate or right established on the trial
by the plaintiff. Defendant asked for a new trial, in

refusing which the court, stating that the showing made was persuasive that the motion should be granted, said:

"The situation of the case is such that two propositions are involved which ought to be settled by the Supreme Court before another trial, if there is to be one. Therefore I am formally denying the motion and leaving the appellate court (according to the statute) to pass upon the merits of the motion, if it shall be necessary, after disposing of the two matters involved in the trial itself. These two propositions involved are as follows:

"(1) Defendant insists that the plaintiff cannot maintain an ejectment suit because the deed from his grantor, Burch, is but a quitclaim deed with Burch not at the time in actual possession or occupancy of this strip of land, while plaintiff insists this principle of ejectment law is not applicable to the situation in the present case.

"(2) Plaintiff also insists that if wrong in his above contention, still that possession of a part is possession of all, and it being conceded that Burch was in actual possession of the unplatted farm on the east side of Glenwood avenue, it is, for the purposes of this suit, possession of the strip claimed by plaintiff. Against the objection of defendant this question of possession by Burch was left to the jurors, who found in favor of the plaintiff.

"It seems to be conceded (and if not the proofs are clear) that Burch was not, at the time, cultivating this strip nor living upon it, and that he took no steps himself to ascertain its exact amount, nor to separate it by fences or boundary lines from lands of the adjoining owners, and that he refused to execute a warranty deed. The affidavits of the jurors have been entirely disregarded."

Testimony for the plaintiff tended to establish the facts now to be stated. Edward Coates owned a part of the north half of the southeast quarter of section 12, town 2 north, of range 9 east, West Bloomfield, bounded on the north by the east and west quarter section line, and on the south by the east and west

one-eighth section line. The western boundary is Pine Lake, and the eastern boundary the town line separating West Bloomfield and Bloomfield townships. He died in 1902, testate, and his estate was settled in the probate court of Oakland county. The executor was Joshua W. Bird, the residuary devisees Cavie and William Richardson. The order closing the estate was made August 27, 1904, and Cavie Richardson having theretofore conveyed to William by two quitclaim deeds his interest in the residuum of the estate, "the real estate of which said deceased died seised and possessed" was assigned to William Richardson, his heirs and assigns, in accordance with the terms of the will and the assignments made by the other residuary devisee. At some time, while Edward Coates was owner, some one, presumably for him, made a plat of a part of the said above-described land which fronts upon Pine Lake. It is not known who made the survey, if one was made, or the plat. It was not dated, signed, or recorded. It was not produced, but what purports to be a copy of it, produced in evidence, shows the land between the lake and a north and south road, called Glenwood avenue, divided as follows: At the north, bounded on the north by the quarter section line, is a highway, 33 feet wide. To the south of the highway and north of the one-eighth section line are 14 lots, numbered from 1 to 14, and an alley 24 feet wide between lots 9 and 10. The shore of the lake is curved, lots to the north and south being in appearance longer than those in the middle of the plat. The highway, Glenwood avenue, appears to be curved, and does not in appearance parallel the lake shore. No courses are given, but the side lines of the lots appear to be parallel and parallel with the section lines. Distances are given, at least on some of the lots. For example, the south lot, 14, bears figures indicating a frontage on the lake of 105 feet and a length, east and

west, of 475 feet, while lot 10 has a shore frontage of 146 feet and length of 295 feet. The total shore frontage of lots 14, 13, 12, and 11, as indicated on the plat, is 405 feet. Distances marked on the highway do not agree with distances marked on the shore line. What Edward Coates did with the land represented on the plat as lying north of lot 10 is not made to appear. A witness testifies to the purchase from him of lot 10, but the deed of conveyance thereof is not before us. No deed of any lot north of lot 10 is produced.

Plaintiff produced the quitclaim deeds made by Cavie Richardson to William Richardson, the earlier instrument dated January 9, 1904, the later one May 31, 1904. The first describes the land on section 12, as follows:

"Also all the northeast part of the S. E. ¼ of section 12, T. 2 N. R. 9 east, being West Bloomfield township bounded north by the E. & W. ¼ line of said section 12, bounded east by the township line between Bloomfield and West Bloomfield; bounded south by what is known as the John Ellenwood farm, and bounded west by the public highway running through said ¼ section. Also all that part of the north part of the S. E. ¼ of said section twelve (12) described as follows: Commencing on the easterly shore of Pine Lake where the line between Edward Coates' land and John Ellenwood's land intersects the same, running thence northeasterly following the shore of said lake 405 feet; thence north 86 degrees 2 minutes east 200 feet; thence southwesterly course, keeping 200 feet distant from the shore of said lake, 419 feet to said Ellenwood's land; thence S. 89 degrees 30 minutes W. 200 feet to the place of beginning being known as lots 11, 12, 13, and 14, according to an unrecorded plat called Scarborough Beach. Also all that part of the N. part of the S. E. ¼ of section 12: Commencing on E. shore of Pine Lake at a point 575 feet northeasterly from a point where the line between Edward Coates' and John Ellenwood's land intersects said lake, thence northeasterly and northerly following the meander line of said lake a distance of 385

feet, running thence north 60 degrees 30 minutes E. 185 and 2/10 feet to the W. line of the public highway; thence southerly following west line of said highway 363 and 2/10 feet; thence west on a parallel line with the N. line, 213 and 9/10 feet to the place of beginning, known as lots 6, 7, 8, and 9 on the above-mentioned plat, called Scarborough Beach."

The second deed contains the description following:

"Part of southeast fractional quarter of section twelve (12) town two (2) north of range nine (9) east, Michigan. Being all that part of said quarter section lying westerly of highway running northerly and southerly through the north half of said quarter section, and extending west to high-water mark on east bank of Pine Lake (except lots heretofore sold on the unrecorded plat of Scarborough Beach)."

Plaintiff produced, also, a warranty deed from William Richardson to Andrew MacInnes, in which the parcel of land on section 12 is thus described:

"Also the north part of the southeast fractional quarter of section 12 town 2 north of range 9 east the same being in the township of West Bloomfield and containing 54 30/100 acres of land excepting therefrom ten acres of land heretofore conveyed by the party of the first part to Julius F. Rundell by deed recorded in Liber 211 of deeds at page 247 and excepting such portions of said land as have been heretofore conveyed from that part of said land known as Scarborough Beach by deeds which are upon record."

A deed from Andrew MacInnes to Arthur E. Burch is dated February 9, 1910, is a warranty deed, and describes—

"also conveying the north part of southeast fractional quarter section twelve T. 2 N. R. 9 E. containing 54.30 acres. Being in the townships of West Bloomfield. Excepting from the above premises ten acres of land heretofore conveyed to Julius F. Rundell by deed recorded in Liber 211 of Deeds, page 247. And also excepting such portions of said land as have been heretofore conveyed from that part of said land known

as Scarborough Beach by deeds which are duly recorded in Oakland county register of deeds office."

Plaintiff, a son of the executor of the estate of Coates, learned of an alleged or rumored surplus or excess of land on the lake front, over that described by distances on the unrecorded Coates plat of Scarborough Beach. He employed a surveyor, who found such a surplus, described it, and furnished a description of the same, which was employed in a quitclaim deed, dated June 9, 1913, executed by Burch and his wife to plaintiff, which description is recited in plaintiff's declaration. Plaintiff paid $25 for the conveyance. At the time it was executed, Mr. Burch lived in a house on the east side of the road, Glenwood avenue, exercising, generally, the dominion of an owner over such portions of section 12 as he had title to.

Plaintiff never had possession of the parcel of land in question. Two surveyors gave testimony for plaintiff, each producing a plat and each claiming to have found a piece of land lying between lots 10 and 11 as shown on the Coates plat in excess of the land called for by that plat. They had also had the benefit of a description of land in a certain mortgage executed by Edward Coates in 1895, conveying, on section 12—

"all that part of the north part of the southeast quarter of said section twelve (12) described as follows, commencing on the easterly shore of Pine Lake where the line between Edward Coates' land and John Ellenwood's land intersects the same, running thence northeasterly following the shore of said Lake four hundred and five feet thence north 86 degrees 2 minutes east, two hundred feet, thence southwesterly course keeping 200 feet distant from the shore of said Lake four hundred and nineteen feet to said Ellenwood's land, thence south 89 degrees and 30 minutes west two hundred feet to the place of beginning, being known as lots 11, 12, 13, and 14 according to an unrecorded plat called Scarborough Beach. Also all that part of

the north part of the southeast quarter of said section (12) twelve, commencing on the east shore of Pine Lake at a point 575 feet northeasterly from a point where the line between Edward Coates' and John Ellenwood's land intersects said lake, running thence northeasterly and northerly following the meander line of said lake a distance of 385 feet, running thence north 86 degrees and 30 minutes east 185 2/10 feet to the west line of the public highway, thence southerly following the west line of said highway 363 2/10 feet, thence west on a parallel line with the north line 213 9/10 feet to the place of beginning, known as lots 6, 7, 8, and 9 on above mentioned plat called 'Scarborough Beach.'"

Each of these surveyors in making a survey and plat was governed by distances marked on the unrecorded plat and not by courses. William Richardson had conveyed lots 11 and 12 to defendant's grantor, describing the land as:

"Lots 11 and 12 according to the unrecorded plat of 'Scarborough Beach' and described as follows: Commencing at a point on the westerly side of the public highway running northerly and southerly through the southeast quarter of section 12 of said township, distant 178 feet northeasterly from the point where the north line of the southwest quarter of the southeast quarter of said section crosses the westerly line of said highway; thence northerly along the westerly line of said highway 170 feet; thence westerly parallel with the north line of said southwest quarter of said southeast quarter of said section 12 to the highwater mark on the bank of Pine Lake; thence southerly along the highwater mark 200 feet; thence easterly parallel with said north line to the place of beginning."

Defendant's grantor conveyed to defendant lot 11, describing the land also as beginning at a point in the said highway 256 feet northeasterly from the point where the north line of the southwest quarter of the southeast quarter of said section crosses the westerly line of said highway, thence northerly along the westerly line of said highway 92 feet, thence westerly par-

allel with the north line of said southwest quarter of said southeast quarter of said section 12 to the high-water mark on the bank of Pine Lake, thence southerly along high-water mark 100 feet more or less—

"and to a point intersecting a line drawn westerly from the said point of beginning and parallel with the said north line of said southwest quarter of said southeast quarter of said section twelve, thence easterly along said parallel line to the place of beginning. Being a part of the same premises conveyed to the said party of the first part by Wm. Richardson by deed recorded in Liber 211 of Deeds at page 39."

These conveyances, read together, make lot 12, 78, and lot 11, 92, feet on the highway, and each slightly wider on the shore, with side lines parallel and parallel with the section lines.

Witness Barnett, one of plaintiff's surveyors, testified:

"I was employed to mark out the surplus lot, according to description, and previous deeds covering lots 11, 12, 13, and 14 were furnished to me. I noticed that all the descriptions, in addition to showing a distance on the road at the easterly end of the lots, and a distance on the lake at the westerly end, also called for lines parallel to the one-eighth section line. In locating Mr. Bird's lot I elected to ignore the calls for parallel lines, and depended upon the distances at the easterly and westerly ends of the lots. I do not necessarily survey in this manner, but in this case, the lake frontage being specified and being of value, I realized how difficult it is to run a line, one line parallel to another: if they diverged as they extended towards the lake, it would increase the shore line. That is according to the elements of surveying, generally with all surveys."

The other surveyor, Slater, said he had surveyed Scarborough Beach "from end to end, and located the surplus lot four times." He, also, using the old Coates plat and distances, instead of courses, found a surplus.

On the other hand, Heavenrich, to whom Richard-

son conveyed lots 11 and 12, and who conveyed lot 11 to defendant, had the land, lots 11 and 12, surveyed before he bought it, and a plat of it made in conformity with the survey. Joshua Bird, who had been executor of Coates' estate, and seems to have been business agent for Mr. Richardson, pointed out to Heavenrich the north line of lot 11. This is the undisputed testimony of Mr. Heavenrich. His surveyors set stakes according to his survey, in making which he started at the one-eighth section line on the highway, measured north on the highway, and from the highway to the lake followed a line parallel with the section line. He observed the call for distance on the highway and the call for parallel lines, and disregarded the water frontage indicated in the unrecorded plat.

Measuring along the shore now, 405 feet from the one-eighth section line, brings one to a point which is 28 feet on the shore and 10 feet on the road, south of the north line of lot 11, as it is occupied by defendant.

Mr. Wild, who purchased lot 10 from Mr. Coates in the year 1886, testified:

"*Q.* What did Maj. Coates say about the line, the boundary between your premises and his on the south?

"*A.* He said that at the time, if he should carry that line that was established from the north end of the plat, the same as the rest of the lines north of our property, and carry that same parallel line right through to the Ellenwood fence, there would be an angling condition at the further end of the Ellenwood property.

"*Q.* At the extreme end on the south?

"*A.* Yes, sir; and that he therefore made this plat which he showed me, saying that he should start from the Ellenwood property, the line of that rail fence, and continue the line towards lot 10, in parallel lines, and whatever, if any, of that angling section was found to be on the property that I had bought from him, or in other words—it would be contiguous to my property—I was to have that property. * * * Maj.

Coates said that I was to have that undivided section. * * * And we personally went over the ground; he drove a stake slightly north of the hickory tree on the road which measured along parallel lines from the Ellenwood property. * * * Well, it is the Holliday property—and carried that line due west and struck the tree which Maj. Coates blazed with his ax in my own presence, and he said, 'Here is your line.'

"Q. Do you know whether that tree still stands?

"A. It was standing the last of my information.

"Q. How long ago was that?

"A. About 2 years ago.

"Q. What sort of a tree is that down on the lake bank?

"A. I think it is a hard wood tree of some kind, but whether it was—

"Q. Well never mind, it must be a tree of some size now, at least 6 or 8 inches?

"A. Yes.

"Q. Now that parallel line then was the north line of this remaining property?

"A. Yes, sir.

"Q. And I understand from what you have testified that he told you there would be—there was a little piece of land in between that line and the property which he had deeded to you?

"A. Yes, sir.

"Q. What did he say about that little piece of property in there?

"A. He said, 'That belongs to you, sir.'

"Q. How long ago was that?

"A. Well, that is at least 24 years ago.

"Q. How long did you occupy lot 10 together with your sisters?

"A. Ever since it was purchased until 2 years ago.

"Q. That would be in the neighborhood of 27 years?

"A. Yes, sir.

"Q. How did you occupy it, for what purpose?

"A. Some cottages.

"Q. Did you ever occupy, hold possession of this little piece of property that we have just been speaking about?

"A. I was occupying it.

"Q. What did you do with it?

"*A.* I plowed it up, plowed up the ground at the west and set out berry bushes, and extended it all the way along the line up to the rear of the house, not clear up to the front of course. * * *

"*Q.* Do you know, of your own knowledge, whether during the time that you had possession of that property, any other person claimed it, that is, this narrow piece I am speaking of, between your lot and lot 11?

"*A.* I don't know of any one.

"*Q.* Never heard of any person claiming it?

"*A.* Only recently I heard that Bird made a claim.

"*Q.* Did you ever know of anybody besides yourself, ever having possession of it, during those 24 years?

"*A.* No, sir.

"*Q.* Do you know Arthur E. Burch?

"*A.* Yes, met him a couple of times.

"*Q.* Have you any knowledge or did he ever have possession of that property?

"*A.* He certainly never did.

"*Q.* Did you ever have any talk with him about it?

"*A.* No, sir.

"*Q.* Never?

"*A.* No, sir; if he had attempted possession, I would have fired him off.

"*Q.* So, as a matter of fact, you were in possession of that property for about 24 years?

"*A.* Yes, absolutely."

There is testimony from which it may be inferred that upon, or nearly upon but north of, the eighth section line there was originally a fence, and that if this fence, instead of the true line, was used in making the Scarborough Beach plat, and if shore measurements began at the fence, or at the line of the fence projected to the shore line, which was north of the true line, all measurements on the shore were affected.

The brief for each party contains a statement of facts. Appellant's conclusions from his statement are:

"It being conceded that a surplus strip of land has always existed between lots 10 and 11, any enlarge-

ment of such strip by taking away from lot 11 as the same was described in conveyances and laid out depends entirely upon the accuracy of Slater's and Barnett's surveys and their controlling force over elder surveys. If the former are incorrect, there exists only the surplus strip between lots 10 and 11, which has never been claimed or occupied by the defendant Stimson, but has been held by Wild for more than 20 years. If Slater's and Barnett's surveys are correct and of controlling importance, Arthur E. Burch must have had actual possession of the claimed surplus in order to convey title thereto to the plaintiff, Bird, by quitclaim deed."

Appellee says:

"From defendant's statement of the facts, together with plaintiff's additions thereto, it is a simple conclusion that the plat of the property known as Scarborough Beach was never correctly drawn, and that the lines thereof have never become established lines by record. The calls for parallel lines boundaries of lots 11 to 14, inclusively, on the plat and in the various deeds thereof from William Richardson cannot be correct if those lots are each to be given the exact shore frontage called for on said plat and in said deeds. None of the lots 11 to 14 were ever occupied by their several owners according to the north and south parallel boundaries. Both sides practically admit that if the shore measurements of lots 11 to 14 are to be observed instead of the parallel boundaries on the north and south of them that there is a surplus of 28 feet or thereabouts on the lake shore. The only written record in which Edward Coates, the plattor and original owner, is a party, and the only written record in which any evidence of his intention appears, places the northwest corner of lot 11 at a point 405 feet from the southwest corner of the plat (i. e., the place where the one-eighth line produced cuts the lake, the same being the line between Ellenwood and Coates), which is the location of that corner contended for by the plaintiff, and if said corner so located is the true northwest corner, the surplus of land on the lake shore corresponds to the description claimed in plaintiff's declaration. This record of the original plattor

calls for the shore frontage of the four lots to be exactly the same as called for on the original plat and as called for by the sum of the frontages in the various deeds of those lots from William Richardson, and as located by plaintiff.  All the surveyors in the case, both plaintiff's and defendant's witnesses, agree that if the shore frontage of the four lots 11 to 14 is followed instead of the call for the north and south boundaries of those lots to be parallel, there is a surplus of land on the lake shore over what is called for on the plat as lake shore and in the deeds of those lots from William Richardson.  And three of these surveyors are agreed that the amount of this surplus is at least 28 feet and a fraction."

Of the 13 errors assigned by appellant, 8 are relied upon, namely, the fourth, sixth, and the eighth to thirteenth, inclusive.  Of these, the fourth is based upon objections to the introduction in evidence of plaintiff's Exhibit J, a plat; the sixth, upon the refusal of the court to direct a verdict for defendant; the eighth, ninth, tenth, and eleventh, upon the refusal of the court to give appellant's requests to charge; the twelfth, upon alleged failure of the court to clearly and definitely instruct the jury upon the law as to adverse possession, construction of deeds, and proper methods of surveying; the thirteenth, upon denial of the motion for a new trial.

OSTRANDER, J. (*after stating the facts*).  The first difficulty experienced in a study of the record is in concluding, upon any phase of the testimony, that there exists between the lines of lot 10 and lot 11, as they are called, a strip of land of any size, title to which remained in plaintiff's grantor.  It is a maxim of the law of ejectment that a plaintiff must recover upon the strength of his own title, and not upon the weakness of the title of his adversary.  As the trial court instructed the jury, the burden rested upon plaintiff to establish the fact that there was a piece of land as

contended by him, in the place stated, to which he had obtained a title. Suppose it is true that if one measures along the shore line to the north 405 feet, pursuant to the distance calls in the old plat, he will reach a point 28 feet south of the north line of lot 11 as occupied by defendant. Does it follow necessarily that the owner of lot 11 has 28 feet more of frontage than belongs to him? Does it follow that the original proprietor or proprietors retained title to any 28 feet of the shore frontage? The testimony is that the contour of the shore line varies, and that it has changed and is changing, not greatly, but to some extent. The testimony is that the lake front of lots 14, 13, 12, and 11 is bold and high, and that in an earlier day, at least, there was undergrowth and various difficulties in the way of accurate measurement of the shore line. Beyond this, who can now tell how the shore line was measured? It is evident, and is a point upon which the jury was cautioned, that if a little bay extended into the land on any one or more of these lots, or if a cape ran out into the lake, the actual shore line, at high-water mark, might, at a given time, be double the length of the lot lines on the highway. The only use which can be made in this case of the old plat is to discover from it, if possible, how the original proprietor bounded each description of land. No one is bound by it, and it does not appear that any land was ever conveyed merely by reference to it. There are in it calls other than the shore line distances. There are the distances on the highway and, inferentially, the side lines, parallel, in appearance, with the section lines. There is no presumption that the proprietor designed to narrow any lot on the highway and enlarge it on the water; that his measurements on the highway were inaccurate and those on the water front accurate. The material fact to be gathered from this plat is that in it he described all of the land between

the east and west eighth and quarter lines, intended to embrace every foot of land on the highway, and on the water, in the plat. If he had sold it by reference merely to the lots, by number, he would have had nothing left. But because in the details of his plan are some figures which, considered alone, mathematically treated, do not account for quite all of the land, it is assumed and asserted that there was some land for which the plat does not account.

Mr. William Richardson had an equal right with Mr. Coates, the deviser, to convey the land by such description as he pleased. Mr. Richardson, owning all that Coates had not conveyed, did convey lots 11 and 12—he intended to—and a reference to his deed will show that in bounding what he conveyed he began at a point on the highway, stated a distance or distances on the highway, and expressly described the side lines as being parallel with the section lines, describing the shore frontage indefinitely as "more or less." I find no evidence tending to prove that if this description is followed, defendant will have any land not conveyed by this deed.

It is said that by referring in the deed to the plat the calls of the plat were adopted by reference. But which calls? The expert testimony is to the effect that the shore line distances marked on this plat cannot be found if other calls of the plat are followed.

It is a general rule that if courses and distances do not agree, courses will govern. Like all rules, it must be understood and applied reasonably. I do not hold that by force of this rule defendant must be held to be entitled to judgment, but rather that in considering the old plat and all deeds of the land embraced therein which are in evidence, and considering also the rule, plaintiff has not as matter of law made out his case. If I have not misapprehended the record, if the conveyance by Richardson of lots 11 and 12 em-

braced all the land defendant claims to own, then it is my opinion that the trial judge should have directed a verdict for defendant. If there is in fact a surplus of land, the surplus lying between lots 10 and 11, defendant does not occupy it, and the undisputed evidence is that it has been occupied under claim of ownership for more than 20 years.

As in any event I think the court erred in refusing a new trial and the judgment must be for reversal and a new trial ordered, it is important to consider another phase of the case presented by the assignments of error. Appellant contends that in any event plaintiff cannot maintain this action because he was never dispossessed, and took from one never in possession by quitclaim deed. Upon this point, it is apparent that upon a new trial something material may be added to the record. Mr. Burch, plaintiff's grantor, was not a witness at the trial. His affidavit appears among others offered in support of the motion for a new trial. In this affidavit he states, among other things, that he was asked to give a warranty deed of the disputed strip to plaintiff and declined to do so—

"because of the fact that deponent was in doubt as to the existence of any parcel of land answering such description and because he had never had possession of any such parcel of land."

Independent of what may be developed upon a new trial upon this point, it is the law that the grantee in a quitclaim deed acquires the right and title which his grantor had, and no other. *Messenger* v. *Peter*, 129 Mich. 93 (88 N. W. 209). If Mr. Burch might have maintained the action, then plaintiff may do so. Legal titles only are involved. The testimony of Mr. Burch may develop the fact that he could not himself have maintained this action. But appellant's contention that Burch, because of conveyances made by his grantor and his own deed, might not have constructive posses-

sion of any actually unsold and unconveyed land is not sustained.

The criticisms made of the charge of the court do not appear to be warranted. Considering the case as presenting questions of fact for a jury, the charge fairly presented the issues.

Appellant's fourth assignment of error has been considered. The court should have excluded Exhibit J, since it is admitted that it is not a record of a survey made by the surveyor who made it. Its effect was that of hearsay evidence.

Reversed, with costs to appellant.

KUHN, C. J., and STONE, BIRD, MOORE, STEERE, BROOKE, and FELLOWS, JJ., concurred.

### ON MOTION FOR REHEARING.

OSTRANDER, C. J. In this cause an opinion reversing the judgment went down September 27, 1917. In November, 1917, appellee moved for an order allowing a new trial, and the motion was granted December 28, 1917. The appellee (plaintiff) moved March 9, 1918, for a rehearing, the brief in opposition being filed March 23. The motion is based upon alleged misstatements of fact in the opinion and the argumentative conclusion that had the facts not been misapprehended the judgment would have been affirmed. The opinion will be found *ante,* 582.

A re-examination of the record discloses the fact that the opinion contains at least one misstatement of fact, for which reason the motion, tardily made, is considered. The first misstatement pointed out is that in the opinion it is stated with reference to a certain deed purporting to convey lots 11 and 12 that the shore line of the lots was described indefinitely, as "more or less." The description is correctly set out in the statement of facts in the opinion, the shore line being described as "thence southerly along the high water

mark 200 feet." This was a deed made to defendant's grantor, who conveyed to defendant lot 11 by a deed in which the shore line is described as "thence southerly along high water mark 100 feet more or less." It is probable that the mistake occurred by some confusion of these descriptions taken from copies of the deeds.

The other alleged misstatement of fact pointed out is in the concluding paragraph of the opinion where it is said:

"The court should have excluded Exhibit J, since it is admitted that it is not a record of a survey made by the surveyor who made it. Its effect was that of hearsay evidence."

Exhibit J seems to be first referred to on page 33 of the record. The witness Slater, who was on the witness stand when the plat, Exhibit J, was introduced in evidence, was asked by counsel for plaintiff, whose witness he was, "What did you do, if anything, in regard to drawing that?" meaning Exhibit J. He testified that he drew it, and with care, and entered into details. The objection to the offer was that it was not "the original plat, as being so altered as not to be accurate." The point is, not whether the witness made the plat, but whether it represents a survey which he made of the land. In the original brief for appellant, it is said upon this point,

"Slater testified that his employer gave him a plat to work from when surveying in 1907, and that he himself made Ex. J. 'patterned after the plat Bird had.' We can only conjecture that Bird's plat was, and Slater's testimony is not positive and definite enough to warrant the admission of Ex. J, as a copy of another plat that was not produced nor accounted for in any way by plaintiff."

On the other hand, in the brief for appellee it was said, among other things, and referring to a page of

the record (28), which does not seem to contain anything upon this subject, that Slater testified that this plat was made from actual survey on the ground that it is a correct production of his notes. The matter will, in any event, be corrected as the facts warrant, upon a new trial. But as I before read and do now read the record, Exhibit J is an embellished copy of an old, unauthenticated plat, not produced in court, and is not a record of a survey made by the surveyor who was giving testimony.

It is further urged that the record was misapprehended as is evidenced by the statement in the opinion,.

"The testimony is that the contour of the shore line varies and that it has changed and is changing, not greatly, but to some extent."

It is asserted that

"three surveyors who made surveys running from the year 1907 to the year 1914 all of them testified that the same amount of land was included on the lake shore and their surveys of the lake shore between the same given points correspond to the foot so that the actual testimony in the record is to the effect that the shore line has not changed whatever."

But the testimony of the first of the surveyors to which counsel refers is:

"Experience has taught me that water front lines are changeable," and "in surveying I would always take a parallel line in preference to water front line which I regard as a non-positive or indeterminate line."

Another surveyor to whose testimony counsel refers testified: .

"I did not survey according to the shore line but measured according to the parallel line * * * I never measured any of the shore measurements accurately."

It is not perceived how this testimony requires an

amendment of the statement that "the contour of the shore line varies and that it has changed and is changing, not greatly, but to some extent," especially when one of plaintiff's principal witnesses testified:

"From my experience I can say that the water fronts on all inland lakes change from time to time. Changes are caused by course of water, naturally the water recedes and the line will go out. Ice changes the shore line continuously to a certain extent. In the course of a year it is possible for the shore line of an inland lake to change considerably."

It might be added that it is matter of common knowledge that in the course of the seasons the contour of the shore line of inland lakes, in this latitude, varies.

The opinion will be amended so as to correct the admitted misstatement therein first above mentioned.

The second ground upon which a rehearing is asked is stated in the motion therefor in the following language:

"The opinion of this court that the trial court erred in not granting a new trial is based upon the possibility that the testimony of Burch may throw some light upon his possession actual or constructive of the disputed strip. Our contention is that plaintiff is entitled to maintain his action on his paper title irrespective of any possession actual or constructive by Burch. We spent considerable time in our brief to prove that a grantee under a quitclaim deed may bring ejectment whether or not the grantor was in actual or constructive possession of the premises, provided that the grantor had a legal title and a right to possess. Burch had such title and right to possess here because he took title to all of the undisposed of parts of the Coates farm, including Scarborough Beach, by warranty deed from MacInnes and transferred this same right to the plaintiff Bird. (See deeds Burch to Bird, Exhibit A, R. p. 80, and MacInnes to Burch, Exhibit B, R. p. 82,) (See our brief pp. 13-16 for discussion of the above point.) This

question is one of the questions which was expressly left to the Supreme Court for decision and we would like a ruling upon it for the purpose, if no other, to guide the trial court in a new trial for the reason that whatever the testimony of Burch may be as to his possession, constructive or otherwise, we will contend that plaintiff is entitled to maintain his action of ejectment on his paper title.

"The following authorities from our brief are respectfully called to the attention of the court again," giving 18 citations to statutes, text-books and reported cases. It is enough to refer to the opinion itself, not only to precisely answer the criticism here made, but to indicate the lack of consideration which the point has received.

It remains to consider whether the conclusion that the judgment should be reversed and a new trial should be had is affected by the erroneous assumption of fact. It must be apparent upon a reading of the portion of the opinion in which the assumed fact is stated in connection with the whole opinion that if all reference to the particular deed had been omitted the conclusion must have been the same.

The rehearing is denied.

BIRD, MOORE, STEERE, BROOKE, FELLOWS, STONE, and KUHN, JJ., concurred.